Hovey, Governor, v. The State, ex rel. Carson.

————◆————

No. 14,846.

HOVEY, GOVERNOR, v. THE STATE, EX REL. CARSON.

CONSTITUTIONAL LAW.—*Legislative Power.*—*Enactment of Laws.*—The authority of the Legislature in the enactment of laws is subject to no restrictions except such as are imposed by the Constitution of the State, the Constitution of the United States, and the laws and treaties made in pursuance thereof.

SAME.—*Statute.*—*Construction of.*—A statute must be construed so as to uphold it, if that be fairly possible; and if it be of doubtful constitutionality, the doubts are to be resolved in favor of the enactment.

SAME.—*Appointment to Office.*—*Power.*—*Executive Department.*—While the appointment to office is in its nature an executive act, the exclusive right to exercise the power of appointment is not included in the general grant of power to the executive department.

SAME.—*Power of Appointment.*—*By whom May be Exercised.*—The general power to choose, elect or appoint officers is not inherent in the executive or any other branch of the government, but is a prerogative of the people, to be exercised by them or by those departments of the government to which it has been either expressly or by necessary implication confided or reserved in the Constitution, and neither the people nor those to whom the power has been confided can exercise such power except in conformity with the Constitution and the laws enacted in pursuance thereof.

SAME.—*Law Enjoined by Constitution.*—*Force of.*—A law enacted in obedience to and in execution of the express command of the Constitution, which

Hovey, Governor, *v.* The State, *ex rel.* Carson.

is not in palpable violation of some express constitutional provision, is of as high sanction as though it were found in that instrument.

Same.—*Hospital for Insane.—Legislature May Appoint Officers of.*—As the Constitution enjoins upon the Legislature the duty to make provision by law for the support and maintenance of an institution for the treatment of the insane, this is equivalent to an express grant of authority to provide for the selection of all such agents or officers as that body may deem necessary to accomplish the duty imposed, and it may either appoint such officers or agents itself or commit the power to do so to the Governor.

Same.—*Settled Construction of Provision.—Readoption in New Constitution.—Effect of.*—Where a constitutional provision has received a settled judicial construction, or a uniform legislative exposition, which has been acquiesced in by the other departments and the people, and such provision is afterwards incorporated in a new Constitution, it will be presumed that it was adopted with knowledge of the construction it had previously received, and the courts will adhere to such construction.

Same.—*Power of Appointment.—Practical Construction of Constitution.*—As the Legislature, with the acquiescence of the people and the other departments, uniformly construed the similar provisions of the old Constitution and of the new to confer upon it the power to appoint the trustees for the State hospital for the insane, that construction is now conclusive, and can not be questioned.

Same.—*Authentication of Act.—Absence of Governor's Signature.—Presumption.* —Where an act, which does not have the signature of the Governor, is certified by the legal custodian, and is properly authenticated and complete in form, judicial investigation is at an end, the conclusive presumption being that the act became a law in some constitutional method, without the approval, or notwithstanding the disapproval, of the Governor.

Same.—*Extraneous Facts not Admissible.*—The validity or proper authentication of an act can not be brought in question by instituting an inquiry of fact into matters extraneous to the act itself.

From the Marion Circuit Court.

*L. T. Michener,* Attorney General, *J. H. Gillett, A. C. Harris, W. H. Calkins, F. Winter, R. O. Hawkins, C. F. Griffin* and *W. L. Taylor,* for appellant.

*J. E. McCullough* and *J. T. Hays,* for appellee.

Mitchell, J.—The judgment from which the present appeal is prosecuted requires the appellant, as Governor of the State of Indiana, to issue to the relator, Joseph L. Carson,

a proper commission as one of the trustees of the Indiana Hospital for the Insane. The affirmance or reversal of this judgment depends almost wholly upon the answer that shall be given to the inquiry whether or not the General Assembly is, or can be, under the Constitution, invested with the power to appoint trustees for the government of the various benevolent institutions of the State. The relator affirms the existence of the power, and that it has been duly exercised in his appointment, while the Governor challenges the power of the General Assembly to make the appointment, and asserts, moreover, that the law under which the relator was appointed was not constitutionally authenticated, and for that reason never became a valid enactment.

It may aid in arriving at a proper conclusion to recur briefly to the legislative history of the benevolent institutions of the State, so far, at least, as it relates to the hospital for the insane. The Constitution under which the State government was organized in 1816, made it the duty of the General Assembly " to provide one or more farms, to be an asylum for those persons who, by reason of age, infirmity, or other misfortunes, may have a claim upon the aid and beneficence of society." Sec. 4, art. 9. Pursuant to the duty thus enjoined, the General Assembly, by an act approved January 13th, 1845, created a board, consisting of three commissioners, who were named in the act, and who were directed to select and purchase a suitable tract of land upon which to locate a "State lunatic asylum." They were authorized to receive subscriptions and donations, and to advertise for plans and receive proposals for the erection of suitable buildings, and were required to report to the General Assembly at its next meeting. On January 25th, 1847, five commissioners were appointed by the General Assembly to succeed those previously appointed. By an act approved February 15th, 1848, it was declared that there should be six commissioners of the Indiana Hospital for the Insane, whose term of service should be six years from the date of their appointment, "to be

elected by the joint *viva voce* vote of the General Assembly." This latter act, which prescribed the duties of the commissioners, and made provision for the government of the institution, was in force during the session of the constitutional convention and when the revised Constitution adopted in 1851 took effect. Section 1 of article 9 of the present Constitution reads as follows : " It shall be the duty of the General Assembly to provide, by law, for the support of institutions for the education of the deaf and dumb, and of the blind, and, also, for the treatment of the insane."

The first Legislature that assembled after the revised Constitution was adopted, in obedience to the mandate above set out, enacted laws providing for the support and government of the benevolent institutions of the State. It was provided that six commissioners of the hospital for the insane were to be elected by the joint vote of the General Assembly, three of whom were to serve two years, and three four years, and until their successors were elected by the General Assembly. These commissioners were entrusted with the general control and management of the hospital. They were authorized to appoint a superintendent, matron, and such assistant physicians, stewards and other officers as were necessary to take charge of the patients and hospital, and for the efficient administration of the affairs of the institution. Act approved January 15th, 1852, 1 G. & H., p. 378.

From the initiatory step in the organization of a hospital, for the insane in 1845, until the adoption of the present Constitution, and from thence until the enactment of the law approved March 6th, 1879, under various statutes, the General Assembly appointed the commissioners or trustees, as they are called interchangeably, of the hospital for the insane of the State. The act last above named conferred the power on the Governor, by and with the consent of the Senate, to appoint trustees, but this last act was repealed in February, 1883, when it was again provided that the trustees should be elected by the General Assembly. By the act of

March 5th, 1889, under which the present controversy has arisen, some changes were made in the plan for the constitution and organization of the several boards, and provision was made as before for the election of the trustees by the joint vote of the General Assembly. Under the provisions of this latter act the relator claims to have been elected. It thus appears that from the organization of the hospital for the insane of the State, under the old Constitution and the new, every Legislature that has assembled, with possibly two exceptions, has, without challenge hitherto, asserted the right to create boards and appoint officers for the government of this institution.

The constitutional power of the General Assembly having been challenged by the chief executive of the State, the duty now rests upon the court to consider the questions involved, with that degree of caution and deliberation which their magnitude and the abiding consequences which depend upon their proper solution imperatively demand. Representing one of the co-ordinate departments of the State government, acting under the solemn sanction of official obligation, and realizing that the duty which confronts the court is no less than that of sitting as arbiter to determine a question of power in contention between the General Assembly and the chief executive, representing, respectively, and under equally solemn sanctions, the other great departments of the government under which we live, we are admonished that the gravity of the situation is such as demands our most thoughtful and dispassionate consideration.

At the outset, it is to be remembered, that the authority of the Legislature in the enactment of laws is subject to no restrictions, save only those imposed by the Constitution of the State, the Constitution of the United States, and the laws and treaties made in pursuance thereof; that in construing a statute it is to be done with a view to uphold it, if that is fairly possible, and that if it be of doubtful constitution-

ality, the doubts are to be resolved in favor of the enactment.. *Beauchamp* v. *State*, 6 Blackf. 299 ; *Hedderich* v. *State*, 101 Ind. 564.

That feature of our State Constitution, which is conspicuous in the organic law of every State of the Union, as well as in the Constitution of the United States, and which distributes all governmental powers into three departments, is appealed to as a foundation for the argument against the power of the General Assembly to make the appointments in question. Article 3 of the Constitution divides the powers of government into three separate departments—the legislative, the executive, including the administrative, and the judicial, and it declares that "no person charged with official duties under one of these departments shall exercise any of the functions of another, except as in this Constitution expressly provided." Taking this general distribution of powers among the different departments as a basis, and relying upon those provisions of the Constitution which vest the executive, legislative and judicial powers, respectively, in the Governor, the Legislature and the courts, the argument by which the invalidity of the law is sought to be maintained, following general definitions of what constitutes executive, legislative and judicial power, is to this effect : The power to make appointments to office is essentially and intrinsically an executive function ; legislative power is the power to enact, alter and repeal laws ; while judicial power is the power to construe and interpret the Constitution and laws, and to render judgments and make decrees determining private controversies. Hence, while it is not explicitly asserted, the conclusion to which the argument, if it be well founded, necessarily leads is, that the appointing power is an executive prerogative, which can not be interfered with or exercised by the General Assembly or any other department of the government in the absence of express authority to that end.

It is universally regarded as one of the chief excellences-

of our system, that the departments of government are required to be separate, and that the several branches are, in most respects, practically independent of each other.    It has accordingly become an established rule of constitutional law that where general power has been confided to, or vested in, one department of government, persons entrusted with power in another department will not be permitted to encroach upon the power of, nor exercise functions which pertain and are appropriate to, the other department, unless the authority to do so is conferred in express terms, or unless the exercise of the power becomes necessary and appropriate in order to discharge other constitutional duties and functions expressly committed to it.    *Kilbourn* v. *Thompson*, 103 U. S. 168; *People* v. *Keeler*, 99 N. Y. 463.    It is a fundamental error, however, to assume that the exclusive right to exercise the power of appointment is included in the general grant of power to the executive.    The Federal Constitution declares, with emphasis, that " The executive power shall be vested in a President of the United States," but it was never supposed that this declaration invested the President with the appointing power, which, after long and earnest debate, was conferred upon the chief executive of the nation in express terms. Section 1, Art. 2, U. S. Const.

That the powers of government are separated into legislative, executive and judicial, and are confided to different departments, and that powers committed to one department can not be exercised by persons performing functions in any other, are, as we have seen, well established features of our system.    The boundaries which separate the functions of the different departments are broad, clear and distinct as applied to matters affecting property rights, or private concern, or the execution or enforcement of existing law; but it is not easy, where the Constitution is silent, to discriminate or formulate definitions as to what constitutes legislative, executive or judicial authority, when questions of public policy,

or which relate to the best means and agencies for accomplishing a governmental end or of executing the law are involved. " There is," said COOLEY, J., in *People* v. *Hurlbut*, 24 Mich. 44 (93), " no such thing as drawing between legislative and executive power such a clear line of distinction as separates legislative from judicial; and the Legislature, in prescribing new rules, have necessarily a large discretion as to whether the agencies for putting them in force shall be named by themselves or left to the selection of the executive." *State* v. *Hawkins*, 44 Ohio St. 98 ; *Fletcher* v. *Peck*, 6 Cranch, 87 (136); *Wynehamer* v. *People*, 13 N. Y. 378.

Upon this subject the same eminent authority on constitutional law said : " The authority that makes the laws has large discretion in determining the means through which they shall be executed. * * * Such powers as are specially conferred by the Constitution upon the Governor, or upon any other specified officer the Legislature can not require or authorize to be performed by any other officer or authority. * * * But other powers or duties the executive can not exercise or assume except by legislative authority." Cooley Const. Lim. (5th ed.), p. 135.

The same author, speaking of the exercise of the appointing power, as being an executive act, uses this language : " Where the Constitution contains no negative words to limit the legislative authority in this regard, the Legislature in enacting a law must decide for itself what are the suitable, convenient, or necessary agencies for its execution." Cooley Const. Lim. (5th ed.), p. 136, note.

Respecting appointments to office, at least so far as the question now before us is concerned, the Constitution, as we shall see, has not left the former to be ascertained by inference or abstract definition.

It has been repeatedly affirmed, and it is doubtless true in a sense, that an appointment to office is in its nature intrinsically an executive act, but it by no means follows that the power of appointment may not be confided to other depart-

ments than the executive, unless it has been specially conferred upon that department or denied the other.    *Taylor* v. *Commonwealth*, 3 J. J. Marsh. 401; *Achley's Case*, 4 Abb. Pr. 35; *State* v. *Barbour*, 53 Conn. 76.

An examination of the cases in which expressions in relation to the nature of the act of appointment similar to those above are found, will disclose that no court has ever asserted that the right to make appointments to office was inherently and exclusively an executive prerogative, without regard to some express constitutional provision or legal enactment conferring the power; on the contrary, whenever the subject has been considered, with a view to its practical application to cases in hand, it has been held that the executive has no power of appointment to public office, except as it may relate to those who assist in the discharge of his personal executive duties, beyond such as is expressly conferred by the Constitution and the laws enacted in obedience thereto, and that the Constitution and the laws which confer the power measure the extent of executive authority in that respect. *Mayor* v. *State*, 15 Md. 376; *State* v. *Swift*, 11 Nev. 128; *State* v. *Irwin*, 5 Nev. 111; *Commonwealth* v. *Hanley*, 9 Pa. St. 513; *Collins* v. *State, ex rel.*, 8 Ind. 344.

The Constitution and laws furnish the only rule, and are the charter, by which the Governor's authority in that respect is to be determined.    *Field* v. *People*, 2 Scam. (Ill.) 79. Accordingly, in *Collins* v. *State, ex rel., supra,* in which an act of the Legislature, creating the office of attorney general, and providing for the election of that officer by joint ballot of the General Assembly, was involved, it appeared that after passing the act the Legislature adjourned without filling the office as therein provided.    The office being vacant, the Governor assumed the right to fill it by appointment.    It was held, however, that the executive power of appointment was defined and limited by the Constitution and laws, and that, in the absence of any express power to that end, the appointment was void.    Other authorities to the

same effect might be cited, but the foregoing are deemed sufficient to establish the proposition that the appointing power is not essentially and exclusively inherent in the executive department, and hence that the assertion of such power by a co-ordinate department of the government did not result in an encroachment upon the authority of the executive.

Our first conclusion, therefore, is, that the general power to choose, elect or appoint officers is not inherent in the executive, nor in any other branch of the government, but that it is a prerogative of the people, to be exercised by them, or by those departments of government to which it has been either expressly or by implication confided or reserved in the Constitution, and that neither the people nor those to whom the power has been confided can exercise the power, except in conformity with the Constitution and the laws enacted in pursuance thereof. *People* v. *Hurlbut*, 24 Mich. 44; *Commonwealth* v. *Baxter*, 35 Pa. St. 263; *People* v. *Mathewson*, 47 Cal. 442; 6 Am. & Eng. Encyl. of Law, p. 294.

The Constitution provides specifically the manner in which certain officers are to be chosen; with reference to those not therein provided for, it directs that they shall be chosen as may be prescribed by law. That was the command of the people concerning a right inherent in them.

If the organic law of the State were silent concerning the method of selecting officers whose appointments were not otherwise provided for in the Constitution, it would then be necessary in each case to solve the question by construction, and by considering whether the duty or power in each particular case pertained to the legislative, the executive or the judiciary. But confining ourselves strictly to the case before the court, we assert that the power to appoint agencies for the government of the hospital for the insane is not left to inference, but is expressly conferred upon the General Assembly. As we have already seen, the Constitution in the most explicit terms enjoins upon the General Assembly the

duty to make provision by law for the support and mainte-
nance of this institution.   The solemn obligation thus im-
posed was laid directly upon that body, and it was left abso-
lutely untrammelled as to the means and agencies which it
should employ in executing the high command of the peo-
ple.   The laws enacted from time to time are, therefore, to
be regarded as having been passed in obedience to the con-
stitutional behest, and, as is said in *State* v. *Marlow*, 15 Ohio
St. 114, " This legislation being not merely permitted, but
enjoined by the Constitution, has, in effect, the same high
sanction as though it formed a part of that instrument."
Thus, where it was provided by the Constitution that the Gen-
eral Assembly should provide by law before what authority
and in what manner the trial of contested elections should
be conducted, it was held that an act which provided that
cases involving contested elections, where the officers were of
a certain class, should be tried by the Senate, was within the
discretionary power of the Legislature, and it was declared
that the authority to ascertain facts, and to apply the law to
the facts when ascertained, a function in its nature judicial,
might be conferred upon other departments of the govern-
ment than the judicial.   *State* v. *Harmon*, 31 Ohio St. 250 ;
*State* v. *Hawkins, supra.*  It follows necessarily, if it is within
the discretion of the General Assembly, in the enactment of
a law commanded by the Constitution, or which relates ex-
clusively to matters of political concern, to confer power of
a judicial character upon the Senate, as in one of the cases
cited, and upon the chief executive, as in the other, it may un-
der like circumstances provide by law for the exercise of
functions of an executive character by the Legislature.

Accepting as correct the proposition that a law enacted in
obedience to and in execution of the express command of
the Constitution, which is not in palpable violation of some
express constitutional provision, is of as high sanction
as though it were found in that instrument, the further
conclusion follows that the command of the Constitution

which enjoined upon the General Assembly the duty to provide by law for the support of the benevolent institutions, was equivalent to an express grant of authority to provide for the selection of all such agents or officers as that body should deem necessary to accomplish the duty imposed. Having been thus authorized, the manner of selecting the agencies for the government of these institutions, as provided by the Legislature, is not now open to question by any other department of the government.

Another consideration of a controlling character leads to the same conclusion as that stated above. The General Assembly was charged with the duty already described, and the only constitutional provision outside of what is implied in the section imposing the duty for choosing or appointing agents or officers for the government of the benevolent institutions is the following : "All officers whose appointments are not otherwise provided for in this Constitution shall be chosen in such manner as now is, or hereafter may be, prescribed by law." Section 1, article 15, Constitution.

While it is conceded that the above section authorized the General Assembly to prescribe by law the manner in which the offices here in question should be filled, the contention is that it was not competent nor within legislative discretion to vest the right of appointment in the. General Assembly, but that it was essential to the validity of the law that the appointment of trustees should have been confided to the Governor, or to some other executive or administrative officer or board. This position is not maintained by any authority that is at all applicable. The decision in *State* v. *Kennon*, 7 Ohio St. 546, may be conceded to be a correct exposition of the law, in view of the fact that the Constitution which controlled the judgment of the court in that case, in express terms provided that no appointing power should be exercised by the General Assembly, whereby, as was in effect said by the court in that case, the appointing power by that body was " cut up by the roots." Similar constitutional pro-

visions control the judgments in *People* v. *Bledsoe,* 68 N. C. 457, and *People* v. *McKee,* 68 N. C. 429.

Instead of grants of power to the General Assembly, the controlling element in those cases is that the appointing power was conferred upon the executive, and expressly prohibited to the Legislature. It is a reasonable and well established rule, applicable to the interpretation of a constitutional provision, not only to consider the sense in which those who framed it are supposed to have understood the language employed, but to consider whether a similar provision in the preceding Constitution had received judicial or legislative construction at the time of the adoption of the latter. When a constitutional provision has received a settled judicial construction, or a uniform legislative exposition, which has been acquiesced in by the other departments of government and by the people, and is afterwards incorporated into a new or revised Constitution, the presumption will be indulged that it was retained and adopted with knowledge of the exposition which it had previously received. In such a case courts will feel constrained to adhere to the construction which the provision had theretofore received, and with which it was presumably readopted. *Moers* v. *City of Reading,* 21 Pa. St. 188 ; *Ex Parte Roundtree,* 51 Ala. 42 ; *Cronise* v. *Cronise,* 54 Pa. St. 255 ; *People* v. *Wright,* 6 Col. 92 ; *Mayor* v. *State,* 15 Md. 376 ; *Davis* v. *State,* 7 Md. 151 ; Cooley Const. Lim. 73. Applying this rule, what follows? Section 8, article 4, of the Constitution of 1816 declares, after providing for certain appointments to be made by the Governor, that "all offices which may be created by the General Assembly, shall be filled in such manner as may be directed by law." As we have already seen, the State benevolent institutions were organized while the Constitution of 1816 was in force. Acting under the authority which it was supposed the above provision supplied, the General Assembly uniformly, with the acquiescence of the people and of all the other departments of government, appointed com-

missioners to control these institutions. The General Assembly " directed by law " that the commissioners for the government of these institutions should be appointed by the General Assembly.    This was the practical legislative exposition which the old Constitution had uniformly received, and which was presumably known to the framers of the new, and in view of which the corresponding section in the revised Constitution was adopted.    Note the respect in which the old provision was changed before being incorporated into the new Constitution.    The appointing power theretofore lodged in the Governor was omitted, or eliminated, and the section was made to read:   " All officers whose appointments are not otherwise provided for in this Constitution shall be chosen in such manner as now is, or hereafter may be, prescribed by law."    Section 1, article 15.

Trustees of the hospital for the insane are officers for whose appointment no provision was made in the Constitution.    They are neither county, township nor municipal officers, who were elective or chosen in any other manner at the time the Constitution was adopted.    On the contrary, as we have seen, they were officers who, according to the method existing at the time the Constitution took effect, were appointed by the General Assembly.    That was the prescribed method *then* existing, as well as that uniformly since prescribed by law.    This must, therefore, be regarded as conferring express authority and unlimited power upon the General Assembly to use its discretion in providing for, or prescribing the manner of, the appointment of officers such as those here in question.    *People* v. *Bennett,* 54 Barb. 480 ; *Ohio* v. *Covington,* 29 Ohio St. 102 ; *Walker* v. *City of Cincinnati,* 21 Ohio St. 14 ; *State* v. *The Judges,* 21 Ohio St. 1.

The absolute, unlimited power of prescribing the manner of selecting officers of the class here involved was vested by the people in the General Assembly.    If any doubt remained concerning the power of the General Assembly to make the appointments in the manner prescribed by the law in question,

it would be the duty of the court, before resolving the doubt against the validity of the solemn enactment of a co-ordinate department of the government, to resort to the interpretation uniformly given to the above provision, contemporaneous with and subsequent to its incorporation into the present Constitution. As we have seen, before, contemporaneous with, and uniformly, with the exception of four years since, the General Assembly has, without question or challenge, asserted and exercised the right to appoint the officers who should have the government of these State institutions. *State, ex rel.,* v. *Harrison,* 113 Ind. 434. This long continued, uniform and unchallenged interpretation of the Constitution, sanctioned by the people and acquiesced in by all departments of government, under well established rules of construction must now be regarded as conclusive, and as sufficient to dispel any possible doubt and set the question forever at rest, until the people shall see fit to disturb it by changing the organic law of the State. *Board, etc.,* v. *Bunting,* 111 Ind. 143; *State, ex rel.,* v. *Harrison,* 116 Ind. 300; *Pollock* v. *Bridgeport, etc., Co.,* 114 U. S. 411.

Whatever fluctuations may have occurred in legislation concerning other interests, it must be said that through all the varying tides of political opinion, the General Assembly, for nearly a half century, has adhered with singular steadfastness to such a construction of the Constitution as gave it the right now questioned. If there were no other ground upon which to rest our decision, this unchallenged legislative exposition would prevent the court from interfering.

That the General Assembly may, as was done once before, commit the power to the Governor, can not be doubted. Abiding as our conviction might be concerning the propriety of the Legislature imposing part of the responsibility upon, and sharing the supervision and control of these great institutions with, the chief executive of the State, it would neither be fitting, nor would it avail anything, to express that conviction here. The people have imposed the duty upon

the legislative department, and to the people it must give account, and not to the courts.

The task set this court is performed when we have, in the light of the principles and authorities referred to, stated our conclusions as to the power of the respective departments under the Constitution and the law, which constitute the only chart for the guidance of the court, as it does for the other departments of government.

It only remains that we notice briefly the objection that the bill providing for the reorganization of the several boards is not authenticated as required by the Constitution. What purports to be " a full, true and complete copy of enrolled act No. 249, House of Representatives, passed by the General Assembly of the State of Indiana, over the Governor's veto, as the same appears of record in this office," is officially certified to us by the secretary of state, under the seal of the State. It appears by the endorsement of the secretary thereon to have been received and filed by him in his office on the 5th day of March, 1889. Looking upon the face of the act, its title and contents appear to be complete and perfect in form, and it bears upon its face the attestation of the speaker of the House of Representatives and of the president of the Senate, as the Constitution requires. It does not have upon it the signature of the Governor. We accept as explanatory of the absence of the attestation of the chief executive, the official statement made by the secretary of state, under the seal of the State, that the act " was passed by the General Assembly of the State of Indiana over the Governor's veto."

If this were not deemed a sufficient explanation, the court might, doubtless, avail itself, for mere purposes of information, of any public records which the law makes provision for in order to preserve a history of legislative events. But we do not deem this of any consequence. No evidence which might be resorted to could override the constitutional authentication which appears upon the face of the enrolled act. The function of the court, in that regard, is completely dis-

charged when it receives and determines the validity of an enrolled act, properly certified from the proper depositary, which bears upon its face the constitutional attestation of the presiding officers of the respective houses of the General Assembly. The validity, or proper authentication, of an act can not be brought in question by instituting an inquiry of fact into matters extraneous to the act itself. It must carry the evidence of its authentication on its face, beyond which courts will not look for the purpose of ascertaining whether the act was regularly passed or properly authenticated. *Board, etc.,* v. *Burford,* 93 Ind. 383, and cases cited; *Evans* v. *Browne,* 30 Ind. 514.

An act may become a law in several ways without the signature or approval of the Governor, and when, as in this case, an enactment is certified by the legal custodian, properly authenticated and complete in form, judicial investigation is at an end, the conclusive presumption being that the act became a law in some constitutional method without the approval, or notwithstanding the disapproval, of the chief executive.

The judgment of the Marion Circuit Court is affirmed, with costs.

Filed April 20, 1889; petition for a rehearing overruled June 20, 1889.

## SEPARATE OPINION.

BERKSHIRE, J.—I concur with the conclusion reached in the opinion of the court delivered by MITCHELL, J., that the relator was duly elected one of the trustees for the insane asylum, and should be commissioned as such. But with the reasoning and argument I disagree.

When the present Constitution was adopted the old Constitution was abrogated and all governmental power not granted by the new Constitution rested with the people. The Constitution divides the State government into three departments, the legislative, executive and judicial. I quote a part of section 1, article 3: " No person charged with offi-

cial duties under one of these departments shall exercise any of the functions of another, except as in this Constitution expressly provided." Whatever power the Legislature possesses it derives by grant in the Constitution, and like the other departments is limited to the exercise of the power granted.

The word " expressly," as used in the foregoing article of the Constitution, is defined by Webster as follows: " In an express, direct or pointed manner; in direct terms; plainly." The word " express " is defined: " Directly stated; not implied or left to inference; distinctly and pointedly given; made unambiguous by special intention; clear, plain." Legislative power is the power to enact laws and matters incidentally connected therewith. This, I believe, is the accepted definition.

The power to appoint to office is an executive power or function, and is lodged with the executive (which includes the administrative) department of the government, except where the organic law expressly provides otherwise. The Legislature may create offices, but has no power to appoint officers, except such as relate to the exercise of its legislative functions or power, unless the power so to do is conferred expressly by the Constitution, and then it must be exercised within the letter of the constitutional provision. Nothing can be taken by implication.

There is some appointing power given to the Legislature in our Constitution other than that which relates to the exercise of its legislative power. This grant of power will be found in section 1 of article 15, which reads: "All officers whose appointments are not otherwise provided for in this Constitution shall be chosen in such manner as now is, or hereafter may be, provided for by law." There were certain offices in existence when the present Constitution was adopted that were continued, and no provision is made in the Constitution for the election or appointment of the officers to fill those offices.

At that time the General Assembly claimed and exercised the appointing power as to certain of those officers. The words " now is " in the constitutional provision above, continued the power in the legislative department to appoint those officers, but gave to it no power to appoint others. It gave to the General Assembly no power to create an office and name the incumbent. The officers which the Legislature is given the power to appoint are a class of State officers. No other construction can be given to section 18, article 5, of the Constitution, which reads : " When, during a recess of the General Assembly, a vacancy shall happen in any office, the appointment to which is vested in the General Assembly ; or when, at any time, a vacancy shall have occurred in any other State office, or in the office of judge of any court, the Governor shall fill such vacancy by appointment, which shall expire when a successor shall have been elected and qualified."

The antecedent to which the words " any other State office " relate, is an office " the appointment to which is vested in the General Assembly." Whatever of the offices now in existence, which were in existence when the Constitution was adopted, to which the Legislature appointed the incumbents, section 1, article 15, *supra*, continued the appointing power in the Legislature, and so with the other governmental departments, except so far as has otherwise been provided by law. The Legislature may provide by law for the appointment of all officers not provided for in the Constitution, but the appointing power must be lodged somewhere within the executive department of the government.

The only offices now in existence that existed when the Constitution was adopted, to which the General Assembly exercised the power of appointing the incumbents, are, so far as I have been able to ascertain, the State librarian, warden of the State's prison at Jeffersonville—State prison south—and the trustees of the insane asylum. There may be others ; if so, I have overlooked them. R. S. 1843, p.

101 ; Local Laws, 1845, p. 35 ; Acts of 1847, p. 99 ; Acts of 1848, p. 83.

The trustees of the blind asylum and of the deaf and dumb asylum were appointed by the Governor. Acts of 1845, p. 56 ; Acts of 1846, p. 19 ; Acts of 1847, p. 41.

Practical construction is of very little consequence where it is exercised in violation of the plain provisions of the Constitution.

There is one other question—the authentication of the law by virtue of which the relator claims to be a trustee of the insane asylum. My opinion is, that when a bill passes both houses of the General Assembly by the requisite constitutional majority, is properly signed by the presiding officers, is transmitted to the Governor, and he refuses to sign it, but returns the same with objections to the house where it originated, and the objections are entered at large on its journals, and the bill again passes that house by the requisite constitutional majority, and is transmitted to the other house, together with the Governor's objections, and passes that house by a constitutional majority, it then becomes a law. The Constitution so provides. My opinion is, that in case of a returned bill the journals are proper evidence of its final passage and validity as a law, if not conclusive evidence thereof.

Filed April 20, 1889.

## Separate Opinion.

Coffey, J.—While concurring in the opinion in this case I am unable to agree with my brother Mitchell in the process of reasoning by which the conclusion is reached. I do not believe that the duty conferred on the General Assembly by the Constitution, to provide for the benevolent institutions of the State, carries with it the power to appoint officers to manage such institutions. Certainly no such power is expressed, and if it exists it must be by implication.

An appointment by the Legislature to an office not con-

nected with the discharge of its duties as a legislative body, involves the exercise of executive or administrative functions. By section 1, article 3, of the Constitution, it is prohibited from exercising such functions, unless the power to do so is *expressly* conferred upon it by the Constitution. It is not sufficient that language is used from which such power may be inferred; it must be *expressly* conferred.

In my opinion, section 1, article 15, when construed in connection with the law in force at the time of its adoption, does confer on the Legislature the power to appoint the appellee to the office he is now claiming. By the terms of that section the Legislature has the power to appoint such officers as it had the right to appoint under the law in force at the time of the adoption of the Constitution, unless a different mode of selection was provided for by the Constitution itself. It is upon this ground, and the practical construction heretofore given it, alone, that I am enabled to concur in the opinion in this case. I do not believe that the framers of the Constitution intended to confer on the General Assembly any general appointing power.

Filed April 20, 1889.

### SEPARATE OPINION.

OLDS, J.—I concur in the conclusion reached by MITCHELL, J., as to the right of the General Assembly to appoint the particular officer in question in this case, but I do not concur in all of the reasoning by which such conclusion is reached.

Filed April 20, 1889.